## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

GEORGE COOPER and SARA LYN COOPER,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION & ORDER |
| v. | | |
| | | 12-cv-555-wmc |
| SETH PIONKE, | | |
| | Defendant. | |

*Pro se* plaintiffs George Cooper and Sara Cooper allege that defendant Seth Pionke, a law enforcement officer for the Village of Plover Police Department, violated their Fourth Amendment rights when he entered their home and helped seize their pet dog. Defendant subsequently moved for summary judgment. (Dkt. #19.) Because the court concludes that no reasonable jury could find in plaintiffs' favor on the undisputed facts of the record, it will grant the motion in its entirety and enter judgment in favor of defendant.

### PRELIMINARY MATTERS

Although the Coopers have opposed the motion for summary judgment by filing a brief and a "response to defendant's proposed findings of fact," they failed to adhere to this court's procedures by responding to each of defendant's proposed findings of fact.[1] Specifically, while the Coopers purport to dispute a number of Pionke's proposed facts, they have offered *no* evidence placing those facts into dispute. (*See* Pls.' Resp. DPFOF (dkt.

---

[1] In addition to having access to the court's rules, plaintiffs were also provided with a document titled "Helpful Tips for Filing a Summary Judgment Motion in Cases Assigned to Judge William Conley." This document specifically states, "If a party's response to any proposed fact does not comply with the court's procedures or cites evidence that is not admissible, the court will take the opposing party's factual statement as true and undisputed."

#26).)   In fact, plaintiffs have not even provided their own sworn statements offering a competing account of the events of August 5, 2009.

Instead, plaintiffs' opposition is essentially limited to unsupported argument, both in their brief and in their responses to defendant's proposed findings of fact, including accusations of perjury, irrelevant additional facts and their own lack of personal knowledge. That alone justifies deeming defendant's proposed findings undisputed: the Seventh Circuit has held repeatedly that "[a]rgument is not evidence upon which to base a denial of summary judgment." *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 361 (7th Cir. 1992); *see also Outlaw v. Newkirk*, 259 F.3d 833, 839 & n.2 (7th Cir. 2001) (holding that inmate had presented no evidence contesting prison official's claim that he uttered hostile words, because "although Outlaw denies having said these words in his memorandum . . . none of his affidavits or supporting materials support his denial") (citing *Scherer*, 975 F.2d at 361). Furthermore, upon a review of the entire record, the court finds *no* admissible evidence to support the Coopers' apparent version of events.

Admittedly, in a few limited instances, the Coopers offer a competing version of the facts to which they likely *could* testify based on personal knowledge.  Even giving plaintiffs the benefit of every doubt in light of their *pro se* status, however, Pionke would still be entitled to judgment as a matter of law based on qualified immunity, at a minimum.  *See* Opinion Section II, *infra*.  In any event, the court finds the facts below to be material and undisputed; where the Coopers offer a competing characterization of a fact, the court notes that as well.

UNDISPUTED FACTS

**I.  Background**

Plaintiffs George Cooper and Sara Cooper live on Mission Lane in the Village of Plover.  (For clarity, the court refers to the plaintiffs by their respective first names.)  George had both legs amputated above the knee in 1990.  Sara has had spastic quadriplegic cerebral palsy since birth.  In 2006, George and Sara purchased a dog and named him Prince.

On or about July 30, 2009, in a phone call with the Coopers, social work service coordinator Laura Goetz scheduled a welfare-check meeting at their home for August 5.  In her professional capacity, Goetz had visited the home before and had observed George behaving aggressively towards caregivers during those visits.  In addition, while researching the Coopers, Goetz learned that George had a felony conviction on his record.  Goetz also learned that George had purchased a firearm, and she was concerned that the firearm might be at the Cooper residence.[2]

Because of George's past aggressive behavior and his access to a gun, Goetz was worried about the safety of people attending the August 5 meeting.  (Decl. of Laura Goetz (dkt. #23) ¶ 8.)  To ensure their safety, she asked defendant Officer Seth Pionke, a sworn law enforcement officer for the Village of Plover Police Department, to accompany her inside the Coopers' house.  Given Goetz's request for police assistance and her expressed concerns about George's aggressive behavior towards caregivers on previous visits, Officer Pionke attended the meeting.  (Aff. of Seth Pionke (dkt. #22) ¶ 8.)  Officer Pionke also attended the meeting in an effort to keep the peace in the event of a confrontational

---

[2] Plaintiffs argue that Goetz was aware the firearm had been removed from the residence by law enforcement, but they cite to no evidence in support, nor do they explain how they would have personal knowledge of this fact.

situation.

## II.  The Meeting

### A.  Entering the Cooper Home

Officer Pionke met Barbara Saddison of Adult Protective Services; Kelly Tuttle, owner of Visiting Angels; Kathy Frisch, a nurse from Community Care of Central Wisconsin; and Goetz at the Cooper home at about 1:00 p.m. on August 5, 2009.  When Officer Pionke arrived, George opened the door.  Goetz then asked Officer Pionke to come inside.  George never objected to Officer Pionke's entry into the home.

Officer Pionke entered the Coopers' home at the same time as Goetz and the other caregivers.  He was wearing his uniform and identified himself as a police officer.  In addition, Officer Pionke had met George before.  Specifically, Officer Pionke had been to the Cooper home about a week earlier, on July 29, to investigate the Coopers' claim that they were robbed.

Plaintiffs contend, however, that Officer Pionke did not expressly identify himself upon entry.  While George admits hearing Goetz ask Officer Pionke to enter, he contends that he believed she was inviting his brother-in-law, also named Seth, into the home instead and that he did not recognize that Officer Pionke was present until later, arguing that he has poor vision as a result of a car accident in 1990.  George concedes, however, that Officer Pionke was wearing a law enforcement uniform.

### B.  Conditions in the Cooper Home

Upon entry, Officer Pionke noticed that there was urine on the floor in many places. Furthermore, while Officer Pionke was in the home, the Coopers' dog Prince urinated on

the floor an additional four times. As a dog owner, Officer Pionke understands how a dog will typically indicate that it needs to go outside to relieve itself, but in his opinion, the Coopers' dog did not behave like it had been trained to go outside to relieve itself.  George concedes that Prince urinated on the floor while the meeting was occurring, but he contends that it was due to excitement; he also contends that the stains were carpet glue, food and drink, not urine.

The dog's kennel, located near the back door, was in plain sight.  Near the kennel was a leash that was about four feet long.  The leash was attached to a screw-eye attached to the wall.  George told Officer Pionke that they kept the dog on that leash in order to keep it from jumping on people.

Officer Pionke also observed that the area around the kennel was covered with dog hair: there were several large clumps of matted dog hair on the floor near a five gallon bucket of water, and in addition, both the dog's food dish and the surrounding area were covered in dog hair.  The carpet near the kennel and the adjoining wall had both been scraped by the dog's claws, and there were urine stains on the floor.[3]  The floor of the home also had exposed needles lying on it.  It is undisputed that the dog's living conditions were also in plain sight during Officer Pionke's earlier visit.

## C.  Removal of the Dog

Both because of the dog's living conditions, as well as the social workers' concerns about the dog's contribution to the unsanitary conditions in the Cooper home generally, Officer Pionke called the Humane Society and asked them to send an officer.  Officer Emily

---

[3] Plaintiffs concede that there was carpet and wall damage, but they contend that some damage was actually due to wheelchairs, while other damage was attributable to Prince but occurred when he was a puppy.

Carlson of the Humane Society arrived at the Coopers' home some time thereafter and inspected both the dog's living area and the dog itself.[4]  Ultimately, she decided to take the dog into custody.  When Officer Carlson attempted to take custody of the dog, however, George refused to let go of its collar.  Officer Pionke told George that if he did not cooperate with Officer Carlson, he would be arrested.  At that point, George released the dog, and Officer Carlson removed it from the home.

## III. Post-Meeting

The Humane Society issued five citations to George related to the dog's living conditions: improper sanitation, improper water, improper shelter, improper food, and mistreatment of animals.  George contested these citations, and a trial was held before Judge Flugaur in Portage County.

Ultimately, George was found liable only on the charges of improper sanitation and improper shelter.  Specifically, the judge found George guilty on the sanitation citation because of the stench of the urine and excrement where the dog was kept, and the needles and bloody rags on the floor.  The judge also found George guilty on the shelter citation because of the lack of space for the dog and the fact that the dog was tethered to the wall for extended periods, including overnight while the Coopers were in Madison.  In addition, the Coopers' petition for the return of their dog was denied on April 6, 2010.

---

[4] Officer Carlson was originally named as a defendant in this suit, but the Coopers and Officer Carlson stipulated to the dismissal of the claims against her on July 1, 2014. (*See* dkt. #18.)

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is entitled to a judgment as a matter of law." *Celotex,* 477 U.S. at 323 (internal quotation marks omitted). Based on the undisputed facts set forth above, the Coopers have plainly not met their burden of proof on the claims asserted in this case.

### I. Fourth Amendment Claims

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV.  The Coopers assert that Officer Pionke's warrantless entry into their residence and the assistance he rendered to Humane Society Officer Carlson in seizing the dog violated their Fourth Amendment rights.  Based on the undisputed facts of record, however, the court concludes that Officer Pionke is entitled to summary judgment on both those claims.

### A. The Warrantless Entry

It is well established that "[p]olice generally need a warrant to enter a home." *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003).  However, if "someone with authority to do so consents to the entry, the entry is reasonable and the Fourth Amendment is not violated." *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000).  Moreover, "consent may be manifested in a non-verbal as well as a verbal manner." *Id*. at 863 (homeowner consented to warrantless entry by opening the door and stepping back to allow officers to enter) (citing *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996)).  The determination of whether consent to a warrantless entry into a residence occurred "is a question of fact to be determined by the totality of the circumstances." *United States v. Marshall*, 157 F.3d 477, 483 (7th Cir. 1998).

Here, the undisputed facts show that: (1) when Officer Pionke arrived at the Cooper home, George opened the door; (2) Officer Pionke was wearing his uniform; (3) George had met Officer Pionke about a week prior; and (4) when Goetz asked Officer Pionke to come into the house, George did not object.  Therefore, the undisputed facts show that while it

8

may have been non-verbal, George *did* consent to Officer Pionke's entry into his home knowing that he was a police officer. There are also no facts in the record that even begin to suggest, much less clearly demonstrate, that George's failure to object was the product of duress or coercion. In the absence of any evidence to the contrary, the court concludes that no reasonable jury could find that Officer Pionke entered the Coopers home without consent in violation of the Fourth Amendment. *See Walls*, 225 F.3d at 862.

### B. The Seizure of the Dog

The Coopers also claim that the seizure of their dog violated their Fourth Amendment right to be free from unreasonable seizure.[5] As an initial matter, Officer Pionke argues that he did not seize the dog himself but merely provided backup to the former defendant, Humane Society Officer Officer Carlson. Officer Pionke has a point insofar as individual liability under 42 U.S.C. § 1983 requires personal involvement in the alleged constitutional deprivation, but *direct* participation is not necessary. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). Rather, there must only be "some causal connection or affirmative link between the action complained about and the official sued." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

There is no dispute that Officer Pionke facilitated Officer Carlson's seizure of Prince by providing backup and by requiring George to cooperate with her under threat of arrest. That provides a sufficient causal link between Officer Pionke and the seizure to show personal involvement under § 1983. Accordingly, the court turns to the heart of Officer

---

[5] The Coopers were originally granted leave to proceed on two separate claims for seizure of their dog -- one on May 15, 2007, and the other during the August 2009 visit. There is no allegation that Officer Pionke was involved in the former seizure in any way. (*See* Compl. (dkt. #5) ¶¶ 56-80.)

Pionke's argument: his assertion that the seizure was lawful, and thus reasonable under the Fourth Amendment.

A dog can be lawfully seized pursuant to Wisconsin statutes if there are "reasonable grounds" to believe that the owner has mistreated the animal in violation of chapter 951 of the statutes. Wis. Stat. § 173.13(1)(a)(8). The "reasonable grounds" standard is equivalent to that of "probable cause" under the Fourth Amendment. *Mahnke v. Garrigan*, 428 F. App'x 630, 633 (7th Cir. 2011) (citing *Johnson v. State*, 75 Wis. 2d 344, 249 N.W.2d 593, 595-96 (1977)). Therefore, a threshold issue is whether Officer Pionke had probable cause to believe that the Coopers had mistreated the dog in violation of Wisconsin statutes.

Probable cause exists if the facts and circumstances available would justify a reasonable belief that a crime has been committed. *Mahnke*, 428 F. App'x at 634 (citing *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010); *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001)). As such, probable cause is based on the elements of the applicable criminal statute. *Id*. As noted above, an officer may seize an animal if he or she has probable cause to believe that the animal is being mistreated in violation of chapter 951. Wis. Stat. § 173.13(1)(a)(8). Chapter 951 prohibits, among other things, depriving animals of adequate food, water, or shelter. Wis. Stat. § 951.13 (food must be "sufficient to maintain all animals in good health," water "provided daily and in sufficient quantity for the health of the animal"); Wis. Stat. § 951.14 (prescribing shelter standards, including temperature, space, ventilation and sanitation); *see also Mahnke*, 428 F. App'x at 635.

Based on the undisputed facts, Officer Pionke had probable cause to believe that the Coopers' dog was being kept in violation of Wisconsin law. For purposes of summary judgment, it is undisputed that at the time of the seizure: (1) there was urine on the floor

10

inside the home in many places; (2) the dog urinated on the floor four times in the presence of Officer Pionke; (3) the dog was kept on a four-foot long leash attached to a wall near the back door; (4) the area around the dog's kennel, including around the dog's water dish and in the dog's food dish, was covered with dog hair; (5) the carpet near the dog's kennel and the adjoining wall had been scraped by the dog's claws; and (6) the floor of the home had exposed needles lying on it.  These conditions were in plain view once inside the house. Furthermore, George was later found *liable* on two citations for improper sanitation and shelter -- a fact that supports the reasonableness of Officer Pionke's belief that the Coopers had violated Chapter 951.

At minimum, this undisputed evidence of record demonstrates that Officer Pionke had a "reasonable belief" that the seizure and removal of Prince was justified under Wisconsin statute.  His actions, therefore, satisfied the requirements of the Fourth Amendment, and he cannot be held liable under § 1983 for his participation in the seizure. *See Mahnke*, 428 F. App'x at 635-36.

## II. Qualified Immunity

Even if Officer Pionke's entry into the Cooper home and/or assistance in seizing the dog had been unreasonable as a matter of law, the Coopers must also overcome Officer Pionke's defense of qualified immunity to prevail on their Fourth Amendment claims.  This doctrine exists to "shield[] public officials from liability when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012).   While qualified immunity is nominally an affirmative defense, once a defendant has raised it, the plaintiff has the burden of defeating it.   *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). Specifically, a plaintiff must show that: (1) the facts alleged demonstrate a constitutional violation; and (2) the constitutional right was clearly established.   *Estate of Escobedo*, 702 F.3d at 404 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).   "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

"A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Estate of Escobedo*, 702 F.3d at 404 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).   In contrast, "[i]f officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized."   *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).   Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."   *Malley*, 475 U.S. at 341.   A plaintiff may show that a right was clearly established either by "show[ing], on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

Whether a right was "clearly established" at the time of the purported misconduct is a question of law.   *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009).   The inquiry "must

12

be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier*, 533 U.S. at 201, but courts resolving the question on summary judgment must exercise care to draw inferences in favor of the nonmovant and to avoid "defin[ing] a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866.

Here, because Officer Pionke raised a qualified immunity defense, the Coopers had the burden of defeating it. The Coopers have failed to meet their burden on either prong: they have not shown *either* (1) that the undisputed facts alleged demonstrate a constitutional violation; or (2) that their constitutional rights were clearly established.

Their failure on the first prong is self-explanatory.  As explained above, the undisputed facts do not show a constitutional violation.  However, even if there had been a constitutional violation, Officer Pionke did not violate clearly established law.  *First*, the Coopers have not offered any factually similar cases in which a violation of a homeowner's Fourth Amendment rights were found, and this court is aware of none.  *Second*, Officer Pionke's conduct was not so outrageous as to show an obvious violation.  More specifically, a reasonable officer would not have known that entering a home after being invited in by a social work service coordinator and without protest by the homeowner was unlawful.  *See Walls*, 225 F.3d at 863.  Neither would a reasonable officer know that probable cause was lacking to assist in seizing the dog, given the unsanitary conditions in the home at the time. While officers of reasonable competence could possibly disagree on whether Officer Pionke

13

should have assisted in the removal of the dog, that there is room for disagreement requires a grant of qualified immunity in this case.[6] *Malley*, 475 U.S. at 341.

The above discussion is based on the undisputed facts in this case -- that is, defendant's version of events, which plaintiffs did not oppose with admissible evidence. However, as noted above, the Coopers did present their own gloss on several of defendant's proposed findings of fact (albeit without citation to admissible evidence in support).  Even were the court to assume that the Coopers would offer sworn testimony as to those facts to which they likely have personal knowledge, however, Officer Pionke would still be entitled to summary judgment on qualified immunity grounds.  Under the Coopers' version of the facts, George did not know Officer Pionke was there, believing instead that his brother-in-law Seth was present, and could not recognize him even after he entered at Goetz's invitation due to vision problems.

Crediting this version of events, George may not have *intended* to consent to the entry of Officer Pionke, but that is not the issue since it is Officer Pionke's good faith that matters.  Nothing in the record supports a finding that Pionke could not have known that at the time he entered the home in his uniform, George was unaware he was a police officer.  And that is the relevant question before the court, not whether subsequent developments undermine the apparent consent on which he relied.  *See, e.g.*, *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (qualified immunity inquiry asks "if the officer acted reasonably

---

[6] In addition to asserting qualified immunity, Officer Pionke also asserts that even if his entry into the Cooper home otherwise violated the Fourth Amendment, the exceptions for exigent and emergent circumstances and/or community caretaker apply.  None of the case law cited by Defendant was clearly on point, and the court remains skeptical that the exceptions apply.  However, because this court has already granted summary judgment to Officer Pionke on other grounds, it need not and does not decide whether the exigent and emergent circumstances and/or community caretaker exceptions would apply to this situation.

14

under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact").   It was reasonable for Officer Pionke to conclude that his entry into the home was lawful based on homeowner consent after Goetz invited him inside and neither of the Coopers objected.[7]

Likewise, according to plaintiffs, their home was more sanitary, and Prince's living conditions less problematic, than Officer Pionke suggests.  They contend that:  many of the stains on the floor came from spilled drinks or glue, rather than urine; that Prince only urinated inside because he was excited; and that the damage to the hall was either attributable to Prince's earlier "puppy phase" or was actually caused by a wheelchair.  But again, even presuming these facts are true, nothing in the record suggests that Officer Pionke *knew* them, and so they cannot retroactively render his decision unreasonable. Furthermore, Officer Carlson, who worked for the Humane Society, ultimately made the decision to seize Prince; Officer Pionke merely assisted her, in reliance on her conclusion that the dog ought to be removed from the home.  While such reliance could not render an objectively *unreasonable* decision reasonable, it further supports the court's conclusion that as a matter of law Officer Pionke would not have known his conduct to be a violation of plaintiffs' Fourth Amendment rights.

---

[7] Plaintiffs also frame the entire event as a pre-planned "conspiracy" intended to facilitate the seizure of Prince (Pls.' Resp. DPFOF (dkt. #26) ¶ 32), but the court has identified no admissible evidence in the record supporting that theory.  Plaintiffs refer without citation to "case notes" and "testimony at trial," but the latter is not in the record, and after reviewing the case notes submitted by plaintiffs, the only reference the court can discern to a "conspiracy" appears in an e-mail written by George himself.  (*See* dkt. #27-2 at 11.)

### III. Conversion and Trespass

Having granted summary judgment to Officer Pionke on the Coopers' Fourth Amendment claims, the court is left with the Coopers' two state law tort claims for conversion and trespass. (*See* Dec. 31, 2013 Opinion & Order (dkt. #7) 17.) While the court may exercise supplemental jurisdiction over those claims, *see* 28 U.S.C. § 1367(a), it need not exercise that jurisdiction after dismissing all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3).

Ordinarily, "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). There are, however, "three well-recognized exceptions to this general rule": (1) when the statute of limitations has run on the pendent claim; (2) when substantial judicial resources have already been committed such that sending the pendent claim to state court will cause a "substantial duplication of effort"; and (3) when it is "absolutely clear how the pendent claims can be decided." *Id.* at 1251-52.

The former two exceptions do not apply, but the final exception supports this court retaining jurisdiction and resolving the remaining state law claims on their merits. Under Wisconsin law, "[c]onsent to entry onto the land is a defense to an action for trespass." *Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶ 41, 328 Wis. 2d 436, 787 N.W.2d 6 (quoting *The Manor Enters., Inc. v. Vivid, Inc.*, 228 Wis. 2d 382, 391, 596 N.W.2d 828 (Ct. App. 1999)). "Consent may be given expressly or may be implied from the conduct of the plaintiff, from the relationship of the parties or from custom." *Id.* Based on the undisputed facts, the court has already concluded that George Cooper consented to Officer Pionke's entry into his home, which undermines any claim for common law trespass.

16

Likewise, "[c]onversion is the *wrongful or unauthorized* exercise of dominion or control over a chattel." *Farm Credit Bank of St. Paul v. F & A Dairy*, 165 Wis. 2d 360, 371, 477 N.W.2d 357 (Ct. App. 1991) (emphasis added). Having concluded that Wisconsin statutes expressly *authorized* the seizure of the dog here, Officer Pionke could not have *wrongfully* exercised control over it.

Admittedly, the court's conclusions are driven in large part by the Coopers' failure to produce admissible evidence to support their version of events at summary judgment. It is possible that they could remedy that failure in state court, were the court to dismiss the trespass and conversion claims without prejudice, but then Officer Pionke would be forced to relitigate issues he has fairly ripened for summary judgment in this court. This is unfair to him and would give the Coopers an unwarranted second opportunity to produce admissible evidence supporting their claims, even though they were on notice of the need to come forward with all their evidence and utterly failed to do so. *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)) (describing summary judgment as the "put up or shut up" moment in a lawsuit).

On balance, the court concludes that fairness to the defendant, as well as the interests of judicial economy, weigh heavily in favor of retaining jurisdiction over the state law claims. *See Wright*, 29 F.3d at 1252. Since this court has now expended effort to ascertain the undisputed facts for purposes of deciding the Coopers' federal claims, and since those facts clearly demonstrate that Officer Pionke is entitled to judgment in his favor on the Coopers' state law claims as well, it would not be fair to require Officer Pionke to litigate the issues again, nor does it make sense to require a new court to assess the same set

17

of facts.  Accordingly, the court will grant summary judgment to Officer Pionke on all claims and direct that the case be closed.

## ORDER

IT IS ORDERED that:

1) Defendant Seth Pionke's motion for summary judgment (dkt. #19) is GRANTED.

2) The clerk of court is directed to enter judgment and close this case.

Entered this 20th day of April, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

18